## Miller *v.* Lehigh Valley Railroad Company, Appellant.

*Negligence—Railroads—Crossing—"Stop, look and listen"—Collision between train and wagon.*

1. In an action against a railroad company to recover damages for personal injuries sustained at a grade crossing in a collision between a train and a wagon which plaintiff was driving, the case is for the jury where the evidence for the plaintiff although contradicted tended to show that the plaintiff stopped at a point from forty to fifty feet from the track at a point where he could not see far enough to enable him to cross in safety; that he stopped at another place at about twenty feet from the track and looked and listened without seeing the train, that he then approached slowly without another stop, and was struck, and that neither he nor two of his witnesses heard any signals, although the trainmen testified that signals were given.

2. When on part of the testimony of a witness plaintiff is entitled to go to a jury, while on the other part of it he plainly is not, or when the different parts of the testimony of a witness are apparently inconsistent, leaving it uncertain just what his recollection of the facts respecting which he testifies is, it is the province of the jury to reconcile the conflicting statements, whether of the same, or different witnesses, or to draw the line between and say which shall prevail. The same is true of the plaintiff's own testimony.

3. The rule that a plaintiff cannot recover, if, in spite of what his senses must teach him if he uses them, he steps in front of a moving train, is applicable only to clear cases.

Argued Oct. 19, 1914. Appeal, No. 224, Oct. T., 1914, by defendant, from judgment of C. P. Wyoming Co., Oct. T., 1912, No. 136, on verdict for plaintiff in case of James A. Miller v. Lehigh Valley Railroad Company. Before RICE, P. J., ORLADY, KEPHART and TREXLER, JJ. Affirmed.

Trespass to recover damages for personal injuries, and for injuries to a horse and wagon. Before TERRY, P. J.

At the trial the jury returned a verdict for plaintiff for $1,000.

On a motion for judgment n. o. v. TERRY, P. J., filed the following opinion:

The plaintiff was injured while attempting to cross the defendant's main tracks at grade on Bridge street in Tunkhannock borough on October 21, 1911, in the afternoon. He was alone in a buggy driving a horse. The engine of a passing special passenger train struck his horse, he was thrown from the wagon and his leg broken. The horse had to be killed to end its suffering, and the wagon was wrecked. The plaintiff was taken to a hospital, and after leaving there three weeks later used crutches and then a cane to the time of trial, in October, 1913. He brought this suit for damages, alleging the defendant negligently caused the accident by running its train at excessive speed and by not giving warning of its approach to the crossing. The defendant contended it was not negligent, and that the accident was due to the carelessness of the plaintiff in going upon the crossing in front of the engine when it was or should have been visible to him. We declined to give binding instructions for the defendant, and the jury returned a verdict for the plaintiff for $1,000. This motion was then made, but a new trial was not requested. If the

plaintiff was entitled to recover the defendant cannot justly complain of the amount of the verdict, nor has it done so. The motion has recently been argued, and having given the views of counsel due consideration, after a careful study of the testimony and an examination of the authorities cited, and others as well, we have concluded that we could not properly have withdrawn the case from the jury.

The essential facts are substantially as follows:

Bridge street runs north and south, and the direction of the railroad tracks is east and west. Owing to buildings lining the west side of the street in the vicinity of the crossing, no view can be had of the tracks west of it until about on the first one, or very close to it. There are also some buildings on the east side of the street, and along the railroad, a little below or east of the crossing, some trees and bushes; but a view of the tracks east of the crossing can be had for some distance—just how far was disputed. Frank Hancock, an employee of, and called by, the defendant, testified that he had stood there at forty-five feet north of the track and could see east a mile or more, including "the whole curve and clear below the Y." And at fifty feet he said "you could see nearly the whole distance yet, not quite." East of the street the tracks cross a bridge, over a creek, referred to as the railroad bridge, which is 366 feet east of the crossing. East of the bridge there is quite a long curve extending towards the Y, which is 3,286 feet east of the crossing. The bridge is 226 feet long; 1,335 feet east of the crossing is the whistling post; 269 feet west of the crossing is a water crane. The width of the street does not appear in the testimony, that we can find, but it probably is shown on a map offered in evidence, not yet attached to the stenographer's record. The railroad station is on Warren street, the first street west of Bridge street, but just how far from the latter we do not find stated. The plaintiff testified that as he approached

the crossing he saw a train of box, or milk cars moving west, and that he stopped on a little grade that went up on the tracks, with his horse just on the rise, or "standing up the grade." When first asked how far that stop was north of the track, he replied, "Why, I never measured it, but I don't think it was two rods." Later during the trial, having in the meantime, he said, gone and looked, he stated that where he stopped "was about between forty and fifty feet." At this point he said he stopped, looked and listened. He once said that from this stopping place he could not see the bridge, and that he could not see clear around the curve until after getting over the crossing. Again he said, that from this place he could not see far east, maybe ten feet or something like that, and at another time, about twenty feet. But after having gone to the scene of the accident, during the trial, he stated that from such stopping place he could see down, meaning east, the tracks about 250 feet. But on cross-examination he said he could not see far enough to enable him to cross in safety; and that in order to look down the track to see if a train was coming it was necessary to get closer than where he first stopped. The witness Hancock was asked how far it was from the north rail to the foot of the grade—the little grade mentioned—and replied: "Oh, I think it is about sixty feet." Only one witness, Mr. Betts, mentioned a usual stopping place for persons traveling in the direction the plaintiff was going, which he said was about where the plaintiff stopped at the foot of the little grade; but the effect of his testimony was that such point was hardly a safe place. The plaintiff testified that he saw no train, only the milk train that was going in the switch, and that when that went on he started up and after he got within twenty-five feet of the tracks, or closer, he could see east to a point 200 feet beyond the bridge, but not any further on account of bushes in the way, "down there." He said: "And after I started I stopped again before I went on the tracks;

I didn't see any object in the way, and I went on, and my horse got partly over the first rail, and that train came so quick that I didn't have a glance of it before it struck my horse, and that is all I remember about it." He said he "didn't hear it nor see it until just that time;" and that he heard no whistle and the bell was not ringing. At another time on cross-examination (before he testified he had, during the trial, visited the scene of the accident) he testified as follows: "Q. If I understood you yesterday, and I think I am correct, you said you stopped at the foot of the grade, or where your horse began to go up the grade? A. Yes, sir. Q. Well, at that point could you have seen anything of a train coming from the east, if you had looked? A. You couldn't see far, maybe ten feet, or something like that, down the track. There were trees there. Q. Then in order to look down the track to see if a train was coming it was necessary for you to get closer than where you first stopped, was it not? A. Yes, sir. Q. Then if I recollect your testimony correctly, you said you stopped within about ten feet of the track? A. Yes, sir. Q. And you saw nothing, no obstacle, you said, in the way, and you drove on? A. Yes, sir. Q. There was nothing in the way, that you could see, of your driving across the track? A. No, sir, or I wouldn't have started." Again, when last examined about the accident, beginning with a reference to his first stop, he said: "I stopped there and I looked and I didn't see no train coming, and I drove up and I looked and I didn't see no train coming, so I cast my eyes up where they were switching above, I cast my eyes up that way to see if there was a train coming, and at that time I was struck." After another reference to his first stop, and being asked if he stopped again after that, he replied, "It is my impression I did, but I couldn't swear positively." A little later he was asked, "You won't testify as to whether you stopped again after that stopping fifty feet back or not," and he answered, "It is my

opinion I did stop within, well, twenty feet of the track, or maybe closer, I couldn't say." Whether the last three words qualified stopping or distance is not clear. At another time he testified as follows: "Q. Was that at the time you made your last stop, when your horse was within fifteen feet of the track? A. Why, I think I was moving. Q. Did you stop after that? A. No, not after I got that close. A man would be a fool to stop that close, to stop and look. Q. Then as I understand you, you looked at some point there east, down the track, and then you looked up the track, drove on and were struck? A. I seen that the way was clear down the track and I looked up the track to see if there was anything coming that way. Q. Was that the last time you looked down the track? A. I think it was. Q. And then you drove on without stopping? A. Why, I didn't stop after that that I know of." During his first examination in chief appear these questions and answers: "Q. Now, Mr. Miller, let us get back to the time of the accident; was there any bell rung or whistle blown by this train that struck you? A. I didn't hear any. Q. Did you listen for any? A. I listened and looked. I don't think they blowed the whistle or rung the bell at all."

J. W. Kintner, called by plaintiff, testified he saw the latter at a full stop at the foot of the little grade. Also, that "about the time the caboose on the train that was moving in front of him went out of sight he moved up a little closer and kind of halted. I think he seen the road was clear, as far as he could see, and drove right on, from the appearance of the way he moved;" and that "this other engine picked him up and took him out of sight awful quick."

Jennie Stevens, who lived on the east side of Bridge street 139 feet north of the crossing, called by plaintiff, testified she was on a porch on the second floor of her house, and saw him drive along and stop twice before going on the crossing; first in front of her house

and again about the middle of a brick house on the opposite side of the street—which was about the beginning of the little grade spoken of. She said she did not see him stop again; that she was looking at him part of the time and part of the time for the train; that he started across and was struck by the engine of the passenger train. She said the whistle was blown down by the Y.

H. D. Weaver, the engineer on the passenger train, testified that at the Y he shut off steam and started the bell ringing—which he said continued ringing until after the engine stopped—and at the whistling board blew the whistle. He said he was running by the Y fifty miles an hour; that he "reduced the speed down to twenty miles an hour, and in passing the automatic signal"—since erected, as we understand it—"east of the bridge, I may have been going about that rate, and just before I got to the bridge I made another application and went over the bridge, and just before I got to the crossing I saw this man driving up, and he had a gray horse and he was just about stopped, and I didn't think for a moment he was going to drive over, and I saw him touch the horse with the whip, the horse made a plunge and just about that time we struck him. In the meantime I put the air on the emergency, got hold of the whistle cord and just sounded a couple of blasts, just as much as I had time to do, and by that time we struck him." The engineer said when he first saw the horse the engine was probably midway between the bridge and the crossing (which was 183 feet, according to the measurements shown) and that the horse got about halfway over the first rail before he was struck. The engine stopped opposite or near the water crane, about 450 feet from where the engineer said he first saw the horse. On cross-examination he testified in part as follows: "Q. Did you notice him particularly? A. Well, not until after the horse made the lunge. I noticed when he was just about stopped

there and of course I imagined he was going to stay there." (The engineer said the horse was then all of twenty feet from the track.) "Q. Then you say he started up and went on across, or tried to cross? A. Yes. Q. When you saw him start up again about where were you? A. Well, I was pretty close to the crossing then."

Joseph Keller, road foreman of engines, who was on the engine of the passenger train, testified that approaching the Y the train was traveling probably from fifty to fifty-five miles an hour, when the engineer shut off steam and allowed the engine to drift for a ways, then applying the brake reducing the speed, and about the time he left the curve and entered the straight line, about 200 feet from the signal post, he blew the signal for the road crossing, and the bell ringer was operating and ringing the bell. Continuing, the witness said: "At that time we turned over on the straight line and I had a view of the road crossing in front of me 'and I saw nothing in the way to interfere or any obstruction. The train was then decreasing in speed. We went over the bridge in the neighborhood, I suppose, we struck the first span of the bridge at from twenty-five to thirty miles per hour, somewheres in the neighborhood of twenty-five miles per hour, and when we made the other side of the bridge we were probably down to twenty miles an hour. At the last time I had a view of the road crossing I saw nothing in sight and I assumed we had clear sailing into the station, but as we got close to the road crossing, while the train was still reducing in speed, my attention was called to the brakes going on harder, and the whistle giving a succession of blasts, and I immediately got my head up, but I couldn't see anything until after we passed the road crossing, then I saw some object at the front end of the engine which proved to be a horse's head, just bobbing up and down, and the brake was then already set full, and after the train came to a stop I went out through the front cab door and I saw that the horse was fast under the pilot;"

and he said he called attention to the fact that the bell was still ringing.

M. J. Booth, police officer of the defendant, testified he stood near the water crane as the train rounded the curve, heard the whistle signal and that the train approached the crossing, he guessed, about fifteen miles an hour, and when it was probably fifty feet from the crossing he saw the horse's head coming on the crossing, and then he heard short blasts of the whistle and saw the horse struck, and that the bell was ringing when the engine stopped. He said he saw the plaintiff as he approached the crossing and was driving over it—saying later the plaintiff was the length of the horse and rig, maybe ten or twelve feet from the outside rail of the west-bound track. He was asked: "Q. What did you see him do then? A. I think I saw him drive on there, but I didn't see him hit his horse or anything." The witness further said the plaintiff told him that as soon as the milk train had cleared the crossing he drove on and paid no attention to trains advancing on the west-bound track.

Frank Hancock, employed by defendant, to some of whose testimony reference has been made, said he stood on Warren street near the station, when the passenger train was coming, and about that time the horse came on the track, "and he just hit the horse," (meaning the engineer) "and knocked the horse down under the pilot of his engine and the buggy went up against a telephone pole."

Lewis Campbell, a locomotive fireman employed by defendant, testified he was standing on the front of his engine which was close up to Bridge street, on a spur track, doing something on the engine and watching the approaching train, and he noticed the plaintiff driving up close to the crossing, within eight or ten feet of it, and just about the time the engine of the coming train "went to approach the railroad crossing that gentleman tapped his horse a little bit with the whip

and the horse gave a jump and jumped right in front of the engine and the breast beam of the engine struck the horse," and that the train was running about ten or twelve miles an hour.   This witness answered, when asked how the plaintiff was coming, how his horse was coming at that time: "He had pulled up there first to stop at the crossing, right below the crossing where I told you."   Then he was questioned, and answered, as follows: "Q. You mean about ten feet from the crossing.   A. Somewheres around there.   Q. Pulled up to stop? · A. Yes, sir.   Q. And then what did he do? A. As I told you, he started on."

The plaintiff denied striking his horse with the whip.

Aside from that already mentioned, the defendant introduced testimony that a person standing thirty feet, or fifteen feet, from the center of the west-bound track, on the north side of it, and looking east, could see a mile or a mile and a half.   And this was also claimed to appear by some photographs put in evidence by the defendant.   And there was other testimony in behalf of the defendant that this passenger train, when close to the crossing, was running from ten or twelve to fifteen miles an hour.

The trainmen and other witnesses called by the defendant testified the whistle was blown for the crossing down by the Y, and that the bell was ringing continuously from that point until the engine stopped. And two of plaintiff's witnesses testified they heard the whistle near the Y.   One of them was near the station.

On the other hand, the plaintiff said, as we have mentioned, that although he listened he heard no whistle, and that the bell was not ringing.   The then Governor, now President, Wilson, was coming to Tunkhannock on this special passenger train and many persons had gathered at the station to meet him.   Some of them, called by plaintiff, testified they watched the train as it came, for some distance below the crossing, and heard neither whistle nor bell.   B. F. Conrad, one

of them, said he saw the accident and that he walked in that direction, by the engine as it came to about a standstill, and did not hear the bell ringing.

Some of defendant's witnesses who said they heard the whistle and bell were near the station.

## DISCUSSION

There are, obviously, two principal legal questions for discussion. One is whether there was sufficient evidence of the defendant's negligence to submit to the jury. And the other is whether the plaintiff was shown to have been guilty of contributory negligence.

1. Was the defendant negligent? As we deemed the meager testimony adduced by the plaintiff concerning the speed of the train inadequate to establish negligence on the part of the defendant, we directed the jury to disregard it and instructed them that there was no evidence justifying a verdict against the defendant on that ground. Whether we were altogether warranted in assuming, as we did, that the testimony of the trainmen on this question disproved negligence we need not now inquire. The remaining charge against the defendant was its alleged neglect to give warning of the train's approach to the crossing. The defendant's counsel contend that the testimony introduced by the plaintiff to sustain this allegation was merely negative and insufficient to overcome the positive testimony of defendant's witnesses, especially as two of plaintiff's witnesses swore they heard the whistle. But the plaintiff testified, as we have observed, that although he looked and listened he heard no whistle and was positive in his statement that the bell did not ring. In addition several witnesses for the plaintiff who were looking for the train, and watching it as from a distance it approached the crossing (and who stood near some of defendant's witnesses who testified in contradiction) said they heard no signals. This was not merely negative testimony: Daubert v. Del., L. & W.

R. R. Co., 199 Pa. 345; Longenecker v. Penna. R. R. Co., 105 Pa. 328; Quigley v. D. & H. Canal Co., 142 Pa. 388. There was also some negative testimony in corroboration. In regard to the testimony of the two witnesses for plaintiff who said they heard the whistle, that does not conclude him, nor necessarily overthrow the testimony in his behalf: Kohler v. Penna. R. R. Co., 135 Pa. 346; Conyngham v. Motor Co., 15 Pa. Superior Ct. 573; Carlin v. Butler Co., 220 Pa. 194; Crowley v. Penna. R. R. Co., 231 Pa. 286; Adams v. Lehigh Val. Transit Co., 45 Pa. Superior Ct. 623. We think it is clear from these authorities that we could not justifiably have held that the testimony adduced by the plaintiff that warning signals were not given, was insufficient to submit to the jury, though it was strongly contradicted.

2. Was the plaintiff guilty of contributory negligence? That is, did it appear that he disregarded the legal requirement to stop, look and listen before going upon the tracks?

There was ample testimony that he stopped at or near the foot of the little grade north of the tracks, and he said he looked and listened there. It is true that from all the testimony introduced by him in relation to this as a stopping point, it did not appear to be a safe place. It may be noticed, however, that defendant's witness, Frank Hancock, testified that at forty-five feet north of the rail one could see a mile down the railroad line, and nearly that distance at fifty feet. The plaintiff testified that he stopped at that point, between forty and fifty feet. But if we assume, notwithstanding such testimony, that the foot of the grade was not a proper place to stop, how does the case appear?

After the plaintiff had narrated the circumstances of the accident, covering it all, including his stops, he was asked to get back to the time of the accident and, being re-examined, testified, as we have noted, that though he listened and looked he did not hear the whistle or bell. That was a general statement of his conduct

preceding his being struck, not confined to any one act or time. However, his statements in regard to stopping and looking at a second place, closer to the tracks, were not consistent. Some of them denoted he did, others that he did not. And here is where the case may be regarded as close. Counsel for defendant insist that plaintiff's own testimony makes applicable such cases as Carroll v. Penna. R. R. Co., 12 W. N. C. 348; Marland v. R. R. Co., 123 Pa. 487, and others, holding that it is idle for a person thus injured to say he looked and listened if, notwithstanding, he went directly in front of a moving train.

Once the plaintiff stated unqualifiedly that he stopped again, after leaving the foot of the grade. Then he said, "I kind of think I stopped"—"just merely halted." Again ,he testified he stopped and looked. Later he said it was his impression that he did, but that he could not swear positively. And at another time that it was his opinion he did. Once on cross-examination he affirmed a question embodying the fact of his stop. He also testified that if there had been anything in the way he would not have started; and also that having looked he saw the way was clear. All this testimony involved his action when within thirty feet of the track. Some of it was positive and some uncertain. But that the plaintiff, without apparent concern and with no attempt at caution, approached and went directly on the crossing, was negatived by defendant's witnesses as well as by himself. And this, we think, bearing in mind the plain necessity of giving quick and still more careful attention to the tracks west of the crossing, in connection with the conflicting testimony as to the distance a person could see east of the bridge, distinguishes this case from the authorities relied on by the defendant.

When on part of the testimony of a witness a plaintiff is plainly entitled to go to a jury, while on the other part of it he plainly is not, or when the different parts of the testimony of a witness are apparently incon-

sistent, leaving it uncertain just what his recollection of the facts respecting which he testifies is, it is the province of the jury to reconcile the conflicting statements, whether of the same or different witnesses, or to draw the line between them and say which shall prevail: Danko v. Pittsburg Ry. Co., 230 Pa. 295. The same is true of the plaintiff himself: Ely v. Pittsburg, etc., Ry. Co., 158 Pa. 233.

The question of contributory negligence cannot be treated as one of law unless the facts and the inferences from them are free from doubt. If there is doubt as to either, the case is for the jury: Coolbroth v. Penna. R. R. Co., 209 Pa. 433; Yocum v. Reading City, 235 Pa. 552; Ackley v. Bradford Twp., 32 Pa. Superior Ct. 487.

The rule that a plaintiff cannot recover if, in spite of what his senses must teach him if he uses them, he steps in front of a moving train, is applicable only to clear cases: McNeal v. Pittsburg, etc., Ry. Co., 131 Pa. 184; Vincent v. Transit Co., 220 Pa. 350; Schwoerer v. Lehigh Val. R. R. Co., 225 Pa. 28. See also Cromley v. Penna. R. R. Co., 211 Pa. 429; Armstrong v. Penna. R. R. Co., 212 Pa. 228.

We have referred to our direction to the jury that the allegation of excessive speed of the train had not been established by the scanty testimony on that question introduced by the plaintiff. The jury could, however, consider the testimony of the trainmen as to speed, in relation to the question whether, owing to the curve below the bridge and the bushes there, spoken of by the plaintiff, the train might have come in sight after the plaintiff said he looked east the last time. Whether the speed was reduced from fifty or fifty-five miles an hour to the minimum of ten or twelve or fifteen variously claimed by defendant's witnesses, was for the jury to determine after passing upon the credibility of the witnesses and weighing all the circumstances, especially as the road foreman of engines said the train came

on the bridge at twenty-five or thirty miles an hour and
that at the west end of it the speed was "probably"
down to twenty miles an hour. Beyond the bridge and
below where the plaintiff stated bushes obstructed the
view, the train was concededly running at a high rate of
speed, and the jury may have believed that when he
last looked it was not discernible on account of the
bushes, and, as may be inferred from the verdict, that
the time taken by him in then looking west, getting his
horse in motion and going the distance to where it was
struck was sufficient for the train to run from the bushes
to the crossing. The plaintiff testified he was driving on
a walk, and if so the margin of safety could be consid-
ered narrow. It was a matter of seconds, and it seems
to us that the court cannot determine the plaintiff's
right to recover by a mathematical calculation at-
tempted on varying rates of speed at points not def-
initely stated with respect to the reduction of speed.
The situation at the crossing was such that it was the
duty of the engineer, as well as of the plaintiff, to use
caution. It was proven that there were no gates there,
nor was there any watchman. An admission was
placed of record that since the accident visible and
audible signals called bell ringers have been put there.

We have not overlooked the testimony of the two
women who lived in the brick house near the crossing,
that the plaintiff drove to the crossing on a trot. It
was, however, so contrary to the other testimony in
the case, on both sides, on that matter, that it is not
surprising the jury did not credit it.

The question is not whether the court would, if the
case had been left to it without a jury, have held the
defendant responsible, nor whether the court would
have drawn inferences which are involved in the find-
ing of the jury. But unless we can declare as matter
of law that on the facts developed the defendant is not
liable, the verdict must stand. This we cannot do with-
out rejecting the positive versions of the plaintiff as to

his stopping, looking and listening, and that · he did not see the train; nor without also invading the province of the jury as to the credibility of the witnesses, the rate of the speed of the train, the obstruction of a view of the train below the bridge, by bushes there, and the time required or taken by the plaintiff to look and go from where he claimed he last stopped to where his horse was struck. We are of the opinion, under the authorities cited above, that we cannot properly do that.

We are aware that this opinion is long, but it has been made so by quotations from the testimony which we have thought necessary to give a proper understanding of the case.

For the reasons above stated we refuse the motion for judgment for the defendant non obstante veredicto, and direct judgment to be entered upon the verdict.

*Error assigned* was in refusing judgment for defendant n. o. v.

J. Roy Lilley, of Lilley & Wilson, with him James Wilson Piatt, for appellant.

H. S. Harding, for appellee.

OPINION BY ORLADY, J., December 20, 1914:

The plaintiff recovered a verdict of $1,000 in the court below, as damages for injuries he sustained by reason of an accident at a grade crossing of the defendant company's railroad. The court below refused a motion to enter judgment non obstante veredicto, as requested by the defendant, and in a careful opinion, covering fifteen printed pages, reviews the testimony adduced on the trial, and discussed the legal principles involved, so elaborately, fully and fairly, that we may well adopt it as the opinion of this court. It was clearly a case for the jury, on account of the disputed facts. The

contributory negligence alleged against the plaintiff was not so free from doubt that the court would not have been warranted in deciding it as a matter of law. For the reasons given by Judge TERRY, the assignment of error is overruled and the judgment is affirmed.